UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| |
|---|
| NANCY HOLLEMAN, ET AL., |
| Plaintiffs, |
| v. |
| COLONIAL HEIGHTS SCHOOL BOARD, |
| Defendant. |

Action No. 3:11-CV-414

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Colonial Heights School Board's

Motion for Summary Judgment. (Doc. No. 14.) For the reasons stated below, the Court

GRANTS the Motion.

### I.    BACKGROUND

This case concerns Nancy Holleman ("Holleman") and Judy Wells's ("Wells")

(collectively "Plaintiffs") claims under Title VII of the Civil Rights Act of 1964 for hostile

work environment gender discrimination and unlawful retaliation.[1] Holleman, who taught

kindergarten, and Wells, employed as a paraprofessional, worked at North Elementary

School ("North") in the City of Colonial Heights, Virginia. Their claims against the Colonial

Heights School Board ("School Board") relate to allegations against the man who was

principal of the school during the 2006–2007 school year, Thomas Pond ("Pond").

The School Board hired Pond as North's principal in 2006 upon the retirement of

North's previous principal, Bruce Seamster. Seamster's management style has been

---

[1] Holleman has withdrawn an additional claim she asserted under the Age Discrimination in
Employment Act.

characterized as laid back and laissez-faire. Colonial Heights Public Schools Superintendent Dr. Joseph O. Cox, Jr. ("Cox") thought Seamster ran North more loosely in his final two years, focusing more on his transition into retirement rather than on engaging in efforts to improve the school. Cox wanted Seamster's replacement to run North in a tighter manner and hold employees more accountable, and he hired Pond with this in mind.

It is fair to say that Pond did just that. Pond was more direct and assertive in his manner, more demanding of school employees, and strict and stern. Early on in his tenure, he gave a PowerPoint presentation to faculty, staff, and students outlining the changes he would implement at North. If teachers or staff questioned Pond's authority or expressed displeasure with the way he was running the school, he would tell them they could leave or resign. Indeed, Pond made statements such as, "I am the boss here, not you," "If you don't like it, hand in your resignation," "You will do what I say," and "You have no say in this situation." Unsurprisingly, certain employees were displeased with Pond and the new manner in which he ran North.

During the 2006–2007 school year, North had 44 employees, including Pond. Five employees, again including Pond, were men. Only two of the four male employees besides Pond were teachers; the other two were custodians. The remaining 39 employees were women.

A group of six female teachers and professionals that included Holleman and Michelle Petet ("Petet") began meeting to discuss their frustrations with, among other things, the atmosphere at North and the way they perceived Pond treated them. They felt Pond intimidated them, that he was loud and yelled at teachers, and that he was a

micromanager. In these meetings, no one contended that Pond ever made offensive comments about women.

This same group, and in addition Wells, later began meeting with School Board member Joe Green in order to seek his advice and help in dealing with their issues. In their discussions with Green, the group members essentially reiterated the concerns they had already discussed among themselves. During the group's initial meeting with Green on February 5, 2007, Wells reported an incident where Pond grabbed her by the arms in the cafeteria in front of students and teachers. Holleman claims she told Green in this initial meeting that Pond treated women differently than men, but the other women in the group, and Green, deny that any of the women, including Holleman, told Green they were treated differently because they were women.[2] Green encouraged the group members to bring their complaints to Cox. Holleman and Wells continued to communicate with Green during a period from February to June 2007 by telephone and email. None of the emails complain that Pond treated anyone, including Plaintiffs, differently based on gender. Moreover, Green confirms that "gender was never an issue in . . . any of the [group members'] complaints." (Green Dep. 149.)

Group members met with two other School Board members to further discuss their concerns. On February 21, 2007, the group (with the exception of Wells, to the best of Petet's recollection (*see* Petet Dep. 32–33)) met with School Board member Sandra Coleman, and on February 23, Holleman and Jeanette Suttenfield met with School Board

---

[2] To be specific, two of the women, Jeanette Suttenfield and Jennifer Cannon, said they could not recall whether a gender issue was raised with Green. Including assertions in this point in their statement of material facts in dispute pursuant to Local Rule 56(b), Plaintiffs appear to assert that there is some dispute in the evidence with respect to this issue. But there is no dispute that only one individual at the meeting—Holleman—has claimed that Green was told that Pond treated females differently than males.

member Cindy Shortlidge. On each occasion, the group members renewed their complaints about Pond. With respect to these meetings, Holleman alone claims that she complained Pond treated group members badly because they were women. As with the meeting and interactions with Green, no other person recalls anyone stating that Pond treated them badly because they were women.

On February 28, 2007, Wells told Cox about the arm-grabbing incident described above, and on March 7, Wells filed with Cox a formal grievance about the incident. In the grievance, Wells states that Pond gripped both of her arms in front of other faculty and students in the cafeteria, while questioning her loudly and in a harsh and demeaning manner as to whether she knew the student she was reprimanding had a medical condition. Wells said she was scared of the situation and suffered emotional distress as a direct result of Pond's actions. Wells also clarified, however, that she did not feel the physical contact with Pond was sexual in nature.

On March 9, 2007, the group, and in addition Green, met with Cox to discuss their concerns about Pond. They again reiterated the concerns they had brought up among themselves and with the School Board members. Wells recounted the arm-grabbing incident. Furthermore, Petet described physical contact she experienced with Pond on one occasion: Petet told Cox that Pond had rubbed her back while she was in the school's main office. After listening to what the group members had to say, Cox told the group members to put their complaints in writing. During this March 9 meeting, no group member mentioned they felt Pond mistreated them because of their gender.

Having been directed to file their misgivings in writing, the group—with the exception of Wells—on March 16, 2007, signed and tendered to Cox a 21-page grievance

4

("group grievance"). The document is organized into some seven sections, each section containing subheadings devoted to general complaints by the group and individualized complaints of particular group members.[3] Broadly, the relevant issues addressed in the group grievance are complaints about how Pond treated group members personally, how he managed North, and complaints of inappropriate physical contact (labeled in the group grievance as "Sexual Harrassment and Inappropriate Physical Contact"). Some of the more general complaints registered concerned Pond's intimidation, arrogant attitude, and various "anger management issues." In describing in writing Pond's physical contact with her in the main office of the school, Petet specifically noted that she "[h]onestly d[id] not feel that Mr. Pond's actions were meant in a sexual or aggressive way." (Def.'s Ex. 21, at PL0433.)

After receiving and reviewing Wells's March 7 grievance concerning the cafeteria arm-grabbing incident and the March 16 group grievance, Cox discussed the complaints with Pond, and came to North on March 27 and 28 to conduct interviews with faculty and staff. Cox prepared summaries of the employees' responses to seven categories of questions. Cox's summary of his interview with Holleman indicates Holleman complained about Pond's micromanaging and yelling, but that Holleman never claimed this behavior was limited to women. (*See* Def.'s Ex. 23, at 17.) Cox's summary of his interview with Wells shows she characterized the working environment as "hostile," but she likewise never claimed Pond's offensive behavior was limited to women. (*See* Def.'s Ex. 23, at 22–23.) The

---

[3] The seven sections are labeled "Hostile Working Environment," "General Complaints Affecting the Education, Safety, and Well Being of the Students at North Elementary School," "Confrontations with Faculty and Staff," "Lockdown Procedures," "Remediation Program Issues and Complaints," "Residency Issues," and "Sexual Harassment and Inappropriate Physical Contact." (Def.'s Ex. 21.)

summaries also indicate Holleman and Wells cited Pond's taking another teacher, Gail Smith, by the arms as evidence of inappropriate physical contact or sexual harrassment. Smith, however, indicated in her deposition that Pond was "just calming [her] down," as she was upset about emails from a parent and was "using a lot of hand motions" in the course of a discussion with Pond about her desire to have him handle the matter. (Smith Dep. 99–102.) Smith also indicated in an email to Holleman and Wells that she had not been sexually harrassed and that she, and not Pond, was the one who had been "mad." (Def.'s Ex. 24.) Cox learned from the interviews that two other teachers and a paraprofessional witnessed Pond's grabbing of Wells's arms in the cafeteria. All three said that Pond did not yell or scream at Wells and that he was merely trying to calm Wells down as she was disciplining a student wearing a hat indoors. Cox later sent a letter to Wells advising her of these contradictory accounts of the incident.

Pond told Cox, and a number of the interviews conducted at North corroborated, that there was a movement to get rid of him. The School Board denied requests from group members to hear their concerns in executive session. On April 17, 2007, Cox reviewed with the group grievants the results of his interviews. Cox expressed his concern over the apparent movement to oust Pond, and told the grievants that the conflict at North needed to end.

On June 4, 2007, Cox told Wells he did not find her accounts of the cafeteria incident and the incident between Pond and Smith to be credible, and that he would be "holding" her contract for the upcoming year as he had a difficult decision to make, implying that he was considering nonrenewal of Wells's contract. Wells received an email from Green the same day in which he opined that if Wells didn't change her story, she would likely be

6

terminated. Employed by the School Board based on year-to-year contracts, Wells's 2006–2007 contract was set to expire on June 30, 2007. Having received another offer of employment and not having heard anything back from Cox, Wells submitted a letter of resignation on July 20, 2007.

In light of his conclusion that Holleman had been leading a conspiracy to get rid of Pond, and that Holleman and Wells had been badgering Smith to file a false sexual harrasment report in order to further this mission, Cox made the decision to transfer Holleman to teach kindergarten at Tussing, another Colonial Heights elementary school. Holleman's yearly contract was renewed for greater pay, and she suffered no loss of health insurance, life insurance, or other benefits.

This suit ensued on June 28, 2011.

## II.   LEGAL STANDARD

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Therefore, if the nonmoving party's evidence is only colorable or is not significantly probative, summary judgment may be granted.  *Id.* at 249–50.

In considering whether summary judgment is proper, the Court must look to whether a rational trier of fact, viewing the record in its totality, could find for the nonmoving party. *See Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992) (citing *Anderson*, 477 U.S. at 248–49). All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing [the] motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

### III.   DISCUSSION

#### A.   Hostile Work Environment Gender Discrimination Claims

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile work environment claim based on gender discrimination under Title VII, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on [the individual's] sex, (3) was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive work environment, and (4) was imputable to [the] employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (citing *Spicer v. Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc)).

The School Board argues that Holleman and Wells cannot establish the second and third elements: they cannot prove that the offending conduct was based on their sex, nor can they show that Pond's conduct was so severe or pervasive as to alter the conditions of their employment or create an abusive work environment.

8

To prove the second element of a gender-based hostile work environment claim, that the offending conduct was *based on* sex, Plaintiffs need not show they were "subjected to sexual advances or propositions," but to prevail must prove they were "the individual target of open hostility *because of* [their] sex." *Id.* (emphasis added) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242–43 (4th Cir. 2000)). Therefore, Plaintiffs must prove that "'but for' the[ir] . . . gender, [they] would not have been the victim[s] of the discrimination." *Smith*, 202 F.3d at 242.

The School Board contends that Plaintiffs rely only on the argument that Pond was "generally hostile" to women in the workplace. According to the School Board, Plaintiffs' evidence consists of the two events involving physical contact with female employees, and the complaints addressed in the group grievance: Pond rubbed Petet's back—though Petet stated she "honestly d[id] not feel that Mr. Pond's actions were meant in a sexual or aggressive way"—and grabbed Wells's arms for a few seconds. The group grievance alleges that Pond intimidated teachers, acted with arrogance, and exhibited anger management issues. This evidence may establish that Pond at times treated women with anger and hostility, the School Board says, but it fails to show that Pond treated any women— including Holleman and Wells—that way *because of* their gender. The vast majority of faculty and staff at the school were women; that Pond may have spoken sternly to women does not mean he did so because they were women. Likewise, the School Board says the record is devoid of any facts that show Pond touched any woman in a sexual way or because of her gender. Therefore, the School Board submits that Plaintiffs cannot establish the second element necessary for their hostile work environment gender discrimination

claims—that Pond targeted them individually and with open hostility *because of* their gender.

The evidence submitted by Plaintiffs is insufficient to show Pond's conduct was attributable to Plaintiffs' sex. Plaintiffs insist the evidence submitted *does* show that Pond's actions were based on their gender because Pond limited his anger and hostility, threats of termination, and berating and reprimanding, to female employees. The evidence, according to Plaintiffs, shows that neither Holleman nor Wells ever heard Pond say or do anything adverse to the male employees. But the fact that only women, and not men, registered complaints concerning Pond's conduct, does not lead to a rational inference that Pond treated those women in a particular manner *because of* their sex. "A trier of fact may reasonably find discrimination . . . when 'a female victim is harrassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" *Ocheltree*, 335 F.3d at 331–32 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The trier of fact, however, may not reasonably find discrimination when it can only speculate on the *ipse dixit* that complaints by individuals of only one sex mean that the offending conduct complained of must have been motivated by sex. *See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (court should withdraw case from jury's consideration when any verdict in favor of the nonmoving party would necessarily be based upon "speculation and conjecture"). Plaintiffs' hostile work environment claim therefore fails on the "because of sex" prong.

The School Board also argues that Plaintiffs' proof on the "severe or pervasive" prong cannot survive summary judgment. In order to satisfy this element, Plaintiffs must

show that the work environment is so "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In making this determination, the Court must "examine the totality of the circumstances, including '[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Harris*, 510 U.S. at 23). The conduct must be both subjectively and objectively offensive in order to be cognizable under Title VII. *Harris*, 510 U.S. at 21–22. Naturally, courts often assume the conduct is subjectively offensive. *See, e.g.*, *Ziskie v. Mineta*, 547 F.3d 220, 227(4th Cir. 2008). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23).

The School Board maintains Pond's conduct falls well short of conduct that has been deemed sufficiently severe and pervasive to support a hostile work environment claim. All we have here, the School Board asserts, are two single physical acts committed by Pond over the course of a school year (rubbing Petet's back and grabbing Wells's upper arms for a few seconds), and allegations of Pond treating female employees with disrespect and disdain by cursing, yelling, berating, and reprimanding, and even suggesting resignation. Viewing these events in their totality, the School Board contends no reasonable person could find Pond's physical acts threatening or humiliating; they are merely offensive.

11

Suggestions of resignation to employees who resist workplace change, moreover, are routine. The alleged harrassment directed towards Plaintiffs is not even close to satisfying the severity or pervasiveness threshold for a Title VII hostile work environment claim.

Plaintiffs' response is to clarify they never questioned Pond's authority as principal to run the school—rather, their complaint is about the controlling manner in which he did so. Pond's disrespectful treatment, including the cursing, yelling, and reprimanding, occurred not only in private, but also in front of other employees. Taken together, Plaintiffs argue this evidence creates a factual dispute as to whether the atmosphere created by Pond was sufficiently severe or pervasive as to alter the conditions of their employment.

The Court can take Plaintiffs' word that they perceived Pond's conduct to be severe, because Plaintiffs cannot clear the "high bar" necessary to satisfy the severe or pervasive element's objective inquiry:

> [P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. . . . Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal citations, alterations, and quotation marks omitted).

Plaintiffs' more general complaints about Pond's disrespectful treatment, cursing, yelling, and reprimanding, more than anything, seem to reflect their misgivings with the "callous behavior [of their] superior[ ]," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and the personality conflict between Pond and Plaintiffs. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000). There is certainly plenty of evidence in

the record that indicates Pond may not have been the easiest boss to work for. Statements such as "I am the boss here, not you," "If you don't like it, hand in your resignation," "You will do what I say," and "You have no say in this situation," though, do not bespeak of the sort of conduct that gives rise to a hostile work environment claim. The picture the evidence paints—that of a new, authoritarian principal intent on making sure the faculty knew he was in charge, sometimes to a fault—does not create an issue the Court should referee. Indeed, the School Board, and "not the courts, [must] rule on the wisdom and generosity of [Pond's] management practices." *Id.* Furthermore, Wells, and Petet—who is not a party to this case—noted that the incidents of physical contact with Pond were nonsexual in nature. Wells's specific complaint concerning the arm-grabbing incident is that Pond gripped both of her arms in front of other faculty and students in the cafeteria while questioning her loudly and in a harsh and demeaning manner as to whether she knew the student she was reprimanding had a medical condition. The School Board rightly points out that plaintiffs who have been subject to more egregious physical conduct have failed on this element. *See Hopkins*, 77 F.3d at 753–54 (positioning a magnifying glass over a plaintiff's crotch and giving him a congratulatory kiss at his wedding receiving line was "tasteless and inappropriately forward" but not sufficiently severe or pervasive); *Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 410–11 (E.D. Va. 2003) (supervisor gave plaintiff full body hugs, pressed her breasts against plaintiff, revealed her thighs, and demanded after-hours meetings). The conduct in this case simply is not enough to clear the high bar required by the severe or pervasive element.

Plaintiffs cannot prove that the offending conduct was based on their sex, nor can they show it was so severe or pervasive as to alter the conditions of their employment or

create an abusive work environment. Accordingly, their hostile work environment gender discrimination claims must be dismissed.

### B.  Retaliation Claims

Plaintiffs also claim that the School Board engaged in unlawful retaliation against them in violation of Title VII. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Retaliation claims are tested under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc) (noting this expressly). Under this regime, the initial burden rests with the Plaintiffs, who must establish a prima facie case of discrimination. Upon such a showing the burden shifts to the School Board, which must respond with a legitimate, nondiscriminatory reason for its action. When the School Board so responds, the final burden shifts back to the Plaintiffs, who must show that the School Board's nondiscriminatory justification is in reality mere pretext. *McDonnell Douglas*, 411 U.S. at 802–04; *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

The Court must first determine whether Plaintiffs have stated a prima facie case of retaliation. To do so, Plaintiffs must show (1) they engaged in a protected activity, (2) that a materially adverse employment action was taken against them, and (3) that a causal connection existed between the protected activity and the alleged adverse action. *Navy Fed.*, 424 F.3d at 405–06. While the School Board initially argued Plaintiffs have not stated any elements of a prima facie retaliation case, it conceded in its reply brief that Plaintiffs engaged in protected activity in communicating the nature of their complaints to the School

14

Board. (Def.'s Reply 8.) While the School Board still insists Plaintiffs cannot establish either of the remaining elements, the Court will assume the third element, because it is clear that Plaintiffs have not satisfactorily alleged the second element—that an adverse employment action was taken against them.

The adverse employment action must be *materially* adverse, that is, it must be that the School Board's actions might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

Holleman asserts that a jury could find her transfer to Tussing was materially adverse, even though she continued to teach kindergarten, had her contract renewed for greater pay, and suffered no loss of health insurance, life insurance, or any other benefits. Holleman argues that in the wake of *Burlington Northern*, *supra*, a jury could find that transferring an employee like Holleman—who had performed her duties satisfactorily for some 32 years, and who had significant friends and support at North—might dissuade a reasonable worker from making or supporting a discrimination charge. Holleman, however, cites no authority to support the notion that a transfer or reassignment is necessarily an adverse employment action under the *Burlington Northern* standard.

*Burlington Northern* refused to limit the antiretaliation provision to harms, coterminous with Title VII's discrimination provision, that have "an adverse effect on the terms, conditions, or benefits of employment," *id.* at 60 (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001)) (internal quotation marks omitted), and made clear that the harm protected by the provision must be assessed objectively, *see id.* at 67–68, but

15

overwhelming authority continues to hold that transfers like the one at issue are not adverse action. Under *Burlington Northern*'s objective inquiry, district courts in this circuit have held again and again that involuntary transfers have not constituted adverse action under the retaliation provision. *See Sturdivant v. Green*, 1:09-cv-586, 2009 WL 4030738, at *7 (E.D. Va. Nov. 19, 2009) ("When courts have addressed the issue of involuntary transfer in the retaliation context, they have similarly held, even after *Burlington Northern*, that such reassignment did not constitute an adverse employment action.").

This case is quite similar to *Rivera v. Prince William County School Board*, No. 1:09-cv-341, 2009 WL 2232746 (E.D. Va. July 22, 2009), where the district court held there was no adverse action where a fifth grade teacher was transferred to teach third grade at another school in the district. *Id.* at *7–8. Holleman attempts to distinguish this case, but it seems as if the plaintiff in *Rivera* may even have had a stronger case: she initially voiced opposition to the transfer and was assigned to teach a different grade level. The district court noted that the teacher was not "entitled to handpick" the school and grade level she would be transferred to. *Id.* at *8. Here, while Holleman was transferred to a different school, she at least was assigned to teach the same grade level. After *Burlington Northern*, adverse action may be found even if an employee cannot point to a detriment related to the terms or conditions of employment. But it should not be found if the employee cannot offer other allegations that show the action was materially adverse from an objective employee's perspective. Holleman can essentially offer nothing more than the complaint of separation from friends. No reasonable juror could find this incidental employment change materially adverse.

Under the same standard, Wells also fails to state an adverse employment action, as she resigned from her position. Employed by the School Board based on year-to-year contracts, Wells's 2006–2007 contract was set to expire on June 30, 2007. During a June 4, 2007, meeting, Cox told Wells that he did not find her account of the cafeteria incident to be credible. At the time, he told Wells he was "holding" her contract for the upcoming year and had a difficult decision to make, implying that he was considering not renewing her contract. By email on June 4, 2007, School Board member Joe Green told Wells that if she didn't change her story she would likely be terminated. Wells acknowledged, however, that this was Green's opinion. (Wells Dep. 237.) Having received another offer of employment and not having heard anything back from Cox, Wells submitted a letter of resignation on July 20, 2007. Taking for granted the assumption that nonrenewal of Wells's employment contract would constitute an adverse employment action, *see, e.g.*, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009) (collecting decisions from five circuits so holding and adopting this view), Wells voluntarily resigned while Cox was holding her unsigned contract and before he had communicated any decision to her that he would not renew her contract. Accordingly, Wells suffered no adverse action.

As both Plaintiffs fail to state a prima facie case, their retaliation claims must be dismissed.

### IV.   CONCLUSION

For the reasons stated above, the Court GRANTS the School Board's Motion for Summary Judgment.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate order shall issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this ___23rd___ day of February 2012